# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICOLE WELKER and JUSTIN BRINKLEY, individually, and CHARLES B. HADAD, ESQUIRE, as Guardian Ad Litem on behalf of JDWBII, a minor, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:14-CV-149 |
| v. | ) ) | JUDGE KIM R. GIBSON |
| THOMAS A. CARNEVALE, M.D., CLEARFIELD HOSPITAL, PENN HIGHLANDS HEALTHCARE, and PENN HIGHLANDS CLEARFIELD, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**I.     Introduction**

This is a medical malpractice action relating to the birth and delivery of a minor, JDWBII, brought by the minor's parents, Nicole Welker and Justin Brinkley, and the minor's guardian ad litem, Charles Hadad. Named as defendants are Thomas Carnevale, M.D., Clearfield Hospital, Penn Highlands Clearfield, and Penn Highlands Healthcare. Presently pending before the Court is Defendants Penn Highlands Healthcare and Penn Highlands Clearfield's motion for summary judgment (ECF No. 44). These Defendants argue they cannot be held liable for the alleged negligence of the other Defendants. For the reasons that follow, the motion will be granted.

## II. Jurisdiction and Venue

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in the Western District of Pennsylvania.

## III. Factual Background[1]

Nicole Welker presented to Clearfield Hospital on July 19, 2012, in active labor. She was treated by Dr. Thomas Carnevale, the attending obstetrician. Plaintiffs allege that Defendants Dr. Carnevale and Clearfield Hospital improperly administered the drug Pitocin to Welker while she was in labor, resulting in serious and permanent neurological disabilities to her son, JDWBII. Because the allegations of medical malpractice and the child's injuries are not at issue in Penn Highland Healthcare and Penn Highlands Clearfield's motion for summary judgment, the Court will not elaborate further on the factual background relating to the underlying claims. At issue instead, is the nature of the corporate relationship between Penn Highlands Healthcare and Clearfield Hospital.

Clearfield Hospital is a wholly owned subsidiary of Penn Highlands Healthcare, Inc. ("Penn Highlands Healthcare"). (ECF No. 48 ¶ 1.) Penn Highlands Healthcare was incorporated on May 31, 2011. (ECF No. 46 ¶ 2.) On October 1, 2011, Penn Highlands Healthcare entered into an Affiliation Agreement that established a healthcare system

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Plaintiffs, the nonmoving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.") (internal quotations omitted).

consisting of several hospitals in the region, including DuBois Regional Medical Center, Clearfield Hospital, and Brookville Hospital. (*Id.* ¶ 3.) In July 1, 2013, Elk Regional Health Center, Inc. also became affiliated with Penn Highlands Healthcare. (*Id.* ¶ 3.) Each of these hospitals is referred to as a "Tier 1" subsidiary of Penn Highlands Healthcare. While the various healthcare providers affiliated with the respective hospitals are referred to as "Tier 2" and "Tier 3" subsidiaries. (*Id.* ¶ 4.) "Penn Highlands is a community based and controlled healthcare system, the purpose of which is to improve regional access to a wider array of healthcare services in north-central Pennsylvania." (*Id.* ¶ 5.) Penn Highlands Healthcare is a 501(c)(3) charitable organization, as are the hospitals affiliated with it. (*Id.* ¶ 5.) Penn Highlands Healthcare is the sole corporate member of Clearfield Hospital, as well as the other affiliated hospitals. (*Id.* ¶ 6.)

Penn Highlands Healthcare appoints the members of Clearfield Hospital's Board of Directors. (ECF No. 48 ¶ 7.) The Bylaws of Penn Highlands Healthcare reserve the power to approve most major strategic and operational changes before they can be implemented by a subsidiary hospital such as Clearfield Hospital. (ECF No. 47-5 at 9-10, Bylaws § 2.1(b).) For example these include, among other decisions: approving "all fundamental transactions", amendments to bylaws or other organizational/governance documents of the subsidiary, expenditures in excess of $500,000, budgets, and changes in mission or direction, including adding or discontinuing a line of service. (*Id.*)

Clearfield Hospital was incorporated on February 21, 1901, and remains registered with the Pennsylvania Department of State as a corporation in good standing. (ECF No. 46 ¶ 9.) Under the Amended and Restated Bylaws of Clearfield Hospital, effective October 1, 2011,

3

Clearfield Hospital's Board of Directors exercises control over the operation of its facility and employees. (*Id.* ¶ 14.)

Each of the affiliated hospitals must be separately licensed by the Pennsylvania Department of Health, and each facility is responsible for maintaining its license, as well as the various other licenses and permits required for operation. (*Id.* ¶ 16.) Penn Highlands Healthcare is not a licensed healthcare provider. (*Id.* ¶ 17.) Penn Highlands Healthcare does not directly employ any healthcare providers and did not directly employ any of the healthcare providers involved in Welker's treatment on July 19, 2012, including Dr. Carnevale. (ECF Nos. 46 ¶ 18; 48 ¶ 18.) Rather, all of the healthcare providers involved in treating Welker were either employees of Clearfield Hospital, Clear Med (a subsidiary of Clearfield Hospital), or independent contractors with staff privileges at Clearfield Hospital. (ECF No. 46 ¶ 19.) Clearfield Hospital (and thus not Penn Highlands Healthcare directly) owns the land on which the hospital sits, the buildings which it operates, and all of the property inside those buildings. (ECF No. 46 ¶ 22; 48 ¶ 22.) Clearfield Hospital and each of the other affiliated hospitals has its own Medicare billing number and separately contracts with private insurers who pay for the healthcare services it provides. (ECF No. 46 ¶ 24.) Penn Highlands, on the other hand, does not have a Medicare billing number or contracts with third-party payers because it neither provides nor bills for healthcare services, which are provided exclusively by its subsidiaries. (*Id.* ¶ 25.)

According to its balance sheet dated June 30, 2014, Clearfield Hospital has $10,913,227 in current assets and $26,638,856 in total net-assets. (ECF No. 47-7, Clearfield Hospital Balance Sheet.) The parties agree that Clearfield Hospital has $11,000,000 in available insurance coverage for the claims asserted in this case. (ECF Nos. 47 at 5; 49 at 3.)

Penn Highlands Clearfield is not a separate legal entity, but a registered fictitious name owned solely by Clearfield Hospital. (*Id.* ¶ 28.) The name "Penn Highlands Clearfield" was not in use in July 2012, when Welker was treated at Clearfield Hospital, and was not in general use until 2014. (*Id.* ¶ 29.)

On July 16, 2014, Plaintiffs commenced the instant action with the filing of a four-count complaint against Dr. Carnevale, Clear-Med OB/GYN[2], Clearfield Hospital, Penn Highlands Healthcare, Inc., and Penn Highlands Clearfield. (ECF No. 1.) In Count I, Plaintiffs bring a negligence claim against all Defendants. In Count II, Plaintiffs bring a negligence claim against Defendants Clearfield Hospital, Penn Highlands Healthcare, and Penn Highlands Clearfield. (*Id.* ¶¶ 40-42.) In Count III, Plaintiffs bring a claim for corporate negligence against Defendant Clearfield Hospital. (*Id.* ¶¶ 43-46.) In Count IV, Plaintiffs bring a claim for negligent infliction of emotional distress against all Defendants. (*Id.* ¶¶ 47-49.)

On June 24, 2016, Defendants Penn Highlands Healthcare and Penn Highlands Clearfield filed the pending motion for summary judgment and supporting documents. (ECF Nos. 44, 45, 46.) Plaintiffs filed their brief in opposition and related documents on July 25, 2016. (ECF Nos. 47, 48.) Thereafter, Plaintiff submitted a reply brief. (ECF No. 49.) As a result of the foregoing filings, the pending motion is now ripe for adjudication.

**IV.     Standard of Review**

A grant of summary judgment is appropriate when the moving party establishes that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[2] The parties stipulated to the voluntary dismissal of Clear-Med OB/GYN from the case on January 2, 2015. (ECF No. 31.)

matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Mahoney v. McDonnell*, 616 Fed. Appx. 500, 504 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 247). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Id.* (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Connection Training Servs. v. City of Philadelphia*, 358 Fed. Appx. 315, 318 (3d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 324).

V.   Discussion

Penn Highlands Healthcare argues that it is not liable for the actions of its subsidiary, Clearfield Hospital.  Plaintiffs argue in opposition that the corporate veil should be pierced under the theory that Clearfield Hospital is simply an alter-ego of Penn Highlands Healthcare. Penn Highlands Healthcare takes the position that there is no justification for piercing the corporate veil in this case.

"The accepted rule in Pennsylvania is that a corporation is an entity distinct from its shareholders even if the stock is held entirely by one person."  *Coll. Watercolor Grp., Inc. v. Willaim H. Newbauer, Inc.*, 360 A.2d 200, 207 (1976).  There is a "strong presumption in Pennsylvania against piercing the corporate veil." *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (1995).  "Nevertheless, a court will not hesitate to treat as identical the corporation and the individuals owning all its stock and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Good v. Holstein*, 787 A.2d 426, 430 (Pa. Supp. Ct. 2001) (internal quotation marks and citations omitted).  "The corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime."  *Id*.; *see also Pearson v. Component Technology Corp.*, 247 F.3d 471 (3d Cir. 2001) (Piercing the corporate veil is reserved for circumstances where equity demands that the corporate form be disregarded, such as to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime.") (quoting *Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967)).

"[T]here appears to be no clear test or well settled rule" for when a corporate veil can or should be pierced, resulting in a controlling owner being held liable for the actions or debts of its subsidiary. *Id.* Factors that are typically considered by courts in deciding whether to pierce the corporate veil include: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) substantial mingling of corporate and personal affairs; and (4) using the corporate form to perpetrate fraud. *See, e.g., Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F.Supp.2d 675, 695 (E.D. Pa. 2009). "These factors are not exhaustive, nor is every element required for a finding of liability; however, the situation must present 'an element of injustice or fundamental unfairness.'" *Id.* at 695 (quoting *Trustees, Nat. Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003)). The burden is on the party seeking to pierce the corporate veil. *Id*. at 695.

Penn Highlands Healthcare argues there is no reason in this case to overcome the strong presumption under Pennsylvania law that a parent company and its subsidiary are separate entities. Thus, the Court should not pierce the corporate veil and hold it responsible for the actions of Clearfield Hospital. In response, Plaintiffs make two main points: (1) that Penn Highlands Healthcare wields considerable control over Clearfield Hospital; and (2) according to Plaintiffs, that Clearfield Hospital is grossly undercapitalized. (ECF No. 47 at 9-15.)

Plaintiffs' first point is true, but not particularly significant. As already noted, corporate distinctions are generally to be maintained even where one corporation or individual is the sole shareholder of another corporation. *See, e.g., Coll. Watercolor Grp., Inc.*, 360 A.2d at 207. Being the sole shareholder of a corporation carries with it numerous rights and privileges that amount

8

to significant control over the corporation, none of which, by itself, justifies piercing the corporate veil.

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Thus, it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders."

*Black v. JP Morgan Chase & Co.*, No. CIV.A. 10-848, 2011 WL 4102802, at *31 (W.D. Pa. Aug. 10, 2011), report and recommendation adopted, No. 2:10CV848, 2011 WL 4089379 (W.D. Pa. Sept. 14, 2011) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal citations omitted)).

As the case law makes clear, the critical issue is not how much control Penn Highlands Healthcare holds over Clearfield Hospital, but how it uses that control. *See Coll. Watercolor Grp., Inc.*, 360 A.2d at 207 (corporate veil pierced whenever one in control of a corporation uses that control or the subsidiary corporation's assets to further his personal interests). While Penn Highlands Healthcare's Bylaws give it considerable control over Clearfield Hospital, Plaintiffs have not pointed to a single power reserved therein that the very reservation of which is inappropriate or even unusual in a relationship between a parent company and a wholly owned subsidiary.

The other factor Plaintiffs rely upon is the argument that Clearfield Hospital is grossly undercapitalized. "Gross undercapitalization" is one of the four factors courts most often look at in determining whether to pierce the corporate veil. *See. e.g., Siematic*, 643 F.Supp.2d at 695. In support of their assertion that it is undercapitalized, Plaintiffs point to the value of Clearfield

9

Hospital's assets and the size of the insurance policy available to cover their claims and compare the total of the two to other large medical malpractice verdicts in Pennsylvania. (ECF No. 47 at 9-15.) Plaintiffs' argument essentially goes like this: if Clearfield Hospital only has $22,000,000 (just under $11,000,000 in "current assets" plus $11,000,000 of insurance coverage) available to pay toward a judgment in favor of Plaintiffs and judgments in similar cases have been as high as $22,000,000 or even $32,000,000, the verdict in this case could potentially bankrupt Clearfield Hospital, thus meaning that it is undercapitalized. Plaintiff's argument is unpersuasive.

As an initial matter, the financial situation is not quite as simple as Plaintiffs describe. While Clearfield Hospital has only $10,913,227 in current assets, it has $26,638,856 in total net-assets. (ECF No. 47-7, Clearfield Hospital Balance Sheet.) Also as Defendants point out, the handful of verdicts Plaintiffs reference include significant portions that go to paying future medical costs which defendants pay in periodic installments over many years. (ECF No. 49 at 3-5); *see also* 40 P.S. § 1303.509(b) (future damages in medical malpractice cases generally to be made in periodic payments).

More importantly, there is no requirement that a subsidiary always perform well financially in order for its parent to avail itself of the protections provided by corporate form. While undercapitalization is an important factor in piercing the corporate veil analysis, courts look for *gross* undercapitalization suggesting that the shareholder improperly drained or failed to fund the subsidiary. In the Court's view, the sole fact that a worst case scenario lawsuit could conceivably bankrupt a corporation does not by itself justify piercing the corporate veil. Rather, cases where courts have pointed to gross undercapitalization as one of the factors

justifying piercing the corporate veil, the undercapitalization is generally very severe and other factors are usually present which suggest wrong doing, such as siphoning of money or significant loans from the shareholder to the subsidiary. *See. e.g., Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 196-99 (3d Cir. 2003); *In re Blatstein*, 192 F.3d 88, 103-09 (3d Cir. 1999).

Here, besides the fact that Clearfield Hospital does have $26,638,856 in total net-assets plus $11,000,000 in insurance coverage, none of the other factors typically considered in piercing the corporate veil analysis are present. There is nothing in the record to suggest that Penn Highlands Healthcare failed to "observe corporate formalities" with respect to its subsidiaries. There is nothing in the record to suggest there was a "substantial mingling of corporate and personal affairs" or funds. There is nothing in the record to suggest Penn Highlands Healthcare used "the corporate form to perpetrate a fraud." Likewise, there is no allegation that Penn Highlands Healthcare siphoned money from Clearfield Hospital or improperly loaned it significant amounts of money.

Also lacking is an element of "unfairness" which is required. *Siematic*, 643 F.Supp.2d at 695 (in order for a court to pierce the corporate veil, "the situation must present 'an element of injustice or fundamental unfairness.'") (quoting *Trustees, Nat. Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003)). The case law makes clear that "unfairness" requires more than a plaintiff's desire to have access to deeper pockets. *See, e.g., Good*, 787 A.2d at 430 (internal quotation marks and citations omitted) ("The corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime."). Plaintiffs have made no such showing here to overcome the strong presumption under

Pennsylvania law that corporate form should be respected. A reasonable jury could not find from this record that Penn Highlands Healthcare is liable for the actions of Clearfield Hospital. Accordingly, the Court must grant the motion for summary judgment as to Penn Highlands Healthcare.

With respect to Penn Highlands Clearfield, the Penn Highlands Defendants argue that Penn Highlands Clearfield is not a proper party to this case because it is not a separate legal entity, but a registered fictitious name owned solely by Clearfield Hospital which was not in use in July of 2012. (ECF No. 45 at 8-9.) Plaintiffs state in their brief that they do not oppose the dismissal of Penn Highlands Clearfield for the reasons identified by Penn Highlands. (ECF No. 47 at 11.) The Court will grant the motion for summary judgment as to Penn Highlands Clearfield.

**V.     Conclusion**

For the reasons stated above, the motion for summary judgment filed by Defendants Penn Highlands Healthcare and Penn Highlands Clearfield will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICOLE WELKER and JUSTIN )
BRINKLEY, individually, and CHARLES )
B. HADAD, ESQUIRE, as Guardian )
Ad Litem on behalf of JDWBII, a minor, )
)
              Plaintiffs, )    CIVIL ACTION NO. 3:14-CV-149
)
  v. )    JUDGE KIM R. GIBSON
)
THOMAS A. CARNEVALE, M.D., )
CLEARFIELD HOSPITAL, )
PENN HIGHLANDS HEALTHCARE, )
and PENN HIGHLANDS CLEARFIELD, )
)
             Defendants. )

## ORDER

**AND NOW,** this 12th day of December, 2016, upon consideration of the motion for summary judgment filed by Defendants Penn Highlands Healthcare and Penn Highlands Clearfield (ECF No. 44), and in accordance with the accompanying memorandum opinion, **IT IS HEREBY ORDERED** that the motion for summary judgment is **GRANTED.**

BY THE COURT:

*/s/ Kim R. Gibson*

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE